2017 Ark. 368

**AIR EVAC EMS, INC., Petitioner**

**v.**

**USABLE MUTUAL INSURANCE COMPANY d/b/a Arkansas Blue Cross Blue Shield, Respondent**

No. CV–17–103

Supreme Court of Arkansas.

Opinion Delivered: December 14, 2017

Steel, Wright, Gray & Hutchinson, PLLC, by: Nate Steel, Little Rock, Scott Poynter (of counsel), Jeremy Hutchinson, Rogers, and Alex T. Gray; and Whatley Kallas, LLP, by: Henry C. Quillen, pro hac vice, for appellant.

Wright, Lindsey & Jennings LLP, Little Rock, by: Gordon S. Rather, Jr.; Chet Roberts, Little Rock, Arkansas Blue Cross Blue Shield; and Miller & Chevalier Char-

tered, by: Anthony F. Shelley, pro hac vice, for appellee.

Leslie Rutledge, Att'y Gen., by: Shawn J. Johnson, Sr. Ass't Att'y Gen., for appellee, amicus curiae brief in support of appellant.

ROBIN F. WYNNE, Associate Justice

Pursuant to Arkansas Supreme Court Rule 6-8, we accepted two certified questions of law from the United States District Court for the Eastern District of Arkansas, Western Division. Petitioner Air Evac EMS, Inc. (Air Evac), has filed suit against respondent USAble Mutual Insurance Company d/b/a Arkansas Blue Cross Blue Shield (Blue Cross) alleging, among other things, violations of the Arkansas Deceptive Trade Practices Act (ADTPA). Blue Cross has filed a motion to dismiss, alleging that it should receive the benefit of the so-called safe-harbor provision of the ADTPA. Because this court has never expressly interpreted the safe-harbor provision of the ADTPA, we are now presented with the following questions of law:

1. Are the rulings in *DePriest v. AstraZeneca Pharmaceuticals, L.P.*, 2009 Ark. 547, 351 S.W.3d 168, and *Arloe Designs, LLC v. Arkansas Capital Corp.*, 2014 Ark. 21, 431 S.W.3d 277, in conflict with one another, and if so, how should that conflict be resolved?

2. Does the safe harbor provision of the Arkansas Deceptive Trade Practices Act, which exempts "[a]ctions or transactions permitted under laws administered by" state and federal regulators, Ark. Code Ann. § 4-88-101(3), apply to actions or transactions prohibited under laws administered by state and federal regulators?

At issue in both certified questions is the proper interpretation of the safe-harbor provision of the ADTPA, and we exercise our discretion to reformulate the questions and answer the following: Should the ADTPA's safe-harbor provision, Ark. Code Ann. § 4-88-101(3), be applied according to the specific-conduct rule or the general-activity rule? As explained in this opinion, we hold that Arkansas follows the specific-conduct rule.[1]

The ADTPA prohibits a variety of listed practices, including "[k]nowingly making a false representation as to the characteristics ... [or] benefits ... of goods or services," "[k]nowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of ... [i]nability to understand the language of the agreement," and a catchall provision prohibiting "any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(1), (a)(8), (a)(10) (Repl. 2011). Here, the federal district court's order outlines Air Evac's ADTPA claims as follows:

Air Evac alleges Blue Cross has unlawful business practices in violation of the ADTPA in two ways. First, Blue Cross's refusal to contract with ambulance providers violates Arkansas insurance regulations requiring out-of-network costs to have no greater cost than in-network costs when in-network provider list is inadequate. Second, Blue Cross is misleading its customers by informing them they could incur substantial out-of-pocket expenses by using out-of-network providers, except in circumstances involving "Emergency or Imperative Services" provided by out-of-network providers,

1. We decline Blue Cross's invitation to hold that the certified questions need not be answered because its conduct satisfies even the narrowest reading of the safe-harbor provision.

which in those cases, the out-of-network services would be subject to in-network benefits. Air Evac alleges this creates the false impression that plan members would not suffer the significant expenses associated with out-of-network care in emergency situations because Blue Cross does not disclose that there is no in-network benefit for emergency ambulance service, and the extent of its advertised benefit for that service is subject to a potentially illegally low cap. Consequently, insureds never realize the benefit of the emergency exception and when they receive a bill for the out-of-network air transport service that potentially saved their life, Blue Cross's only contribution is an unlawfully capped reimbursement.

The parties agree that, at the relevant time, the safe-harbor provision provided that the ADTPA does not apply to

[a]ctions or transactions permitted under laws administered by the Insurance Commissioner, the Securities Commissioner, the State Highway Commission, the Bank Commissioner, or other regulatory body or officer acting under statutory authority of this state or the United States, unless a director of these divisions specifically requests the Attorney General to implement the powers of this chapter.

Ark. Code Ann. § 4–88–101(3) (Repl. 2011).

■ Generally, there are two different approaches to the safe-harbor provisions found in deceptive-trade-practices statutes: (1) the majority "specific conduct" rule, which looks to whether state law permits or prohibits the conduct at issue and only exempts permitted conduct from DTPA claims; and (2) the minority "general activity" rule, which looks to whether a state agency regulates the conduct, in which case a regulated party enjoys a full exemp-

tion from the DTPA. Nathan Price Chaney, *The Arkansas Deceptive Trade Practices Act: The Arkansas Supreme Court Should Adopt the Specific–Conduct Rule*, 67 Ark. L. Rev. 299, 300 (2014). In a widely cited opinion, the Tennessee Court of Appeals wrote the following when it addressed Tennessee's safe-harbor provision:

The purpose of the exemption is to insure that a business is not subjected to a lawsuit under the Act when it does something required by law, or does something that would otherwise be a violation of the Act, but which is allowed under other statutes or regulations. It is intended to avoid conflict between laws, not to exclude from the Act's coverage every activity that is authorized or regulated by another statute or agency. Virtually every activity is regulated to some degree. The defendant's interpretation of the exemption would deprive consumers of a meaningful remedy in many situations.

*Skinner v. Steele*, 730 S.W.2d 335, 337 (Tenn. Ct. App. 1987) (rejecting contention that acts or transactions involving insurance were expressly exempted from the state's consumer protection act, which exempted acts or transactions "required or specifically authorized" by regulation). We keep this purpose—avoiding a conflict between laws—in mind in answering the question presented.

■ The basic rule of statutory construction is to give effect to the intent of the legislature. *Holbrook v. Healthport, Inc.*, 2014 Ark. 146, at 5, 432 S.W.3d 593, 596. Where the language of a statute is plain and unambiguous, this court determines legislative intent from the ordinary meaning of the language used. *Id.* The word "permit" is defined as follows:

1. To consent to formally; to allow (something) to happen, esp. by an official ruling, decision, or law <permit the in-

spection ·to be carried out>. **2.** To give opportunity for; to make (something) happen <lax security permitted the escape>. **3.** To allow or admit of· <if the law so permits>.

*Black's Law Dictionary* 1322 (10th ed. 2014). Air Evac contends that for the safe harbor to apply, an action or transaction must be "permitted"—not merely subject to regulation, and certainly not prohibited. This invokes a definition of "permit" in the sense ·of actively or formally allowing something to happen. Blue Cross, on the other hand, points to the possibility of "permit" meaning to passively allow something to happen, and it argues that this is characteristic of the general-activity rule (i.e., the entity is subject to regulation but the regulator may not have addressed the action at issue). Thus, the word "permit" could support either interpretation.

We turn now to the ADTPA as a whole. *Dickinson v. SunTrust Nat'l Mortg. Inc.*, 2014 Ark. 513, at 4, 451 S.W.3d 576, 579 ("When a statute is ambiguous, this court must interpret it according to legislative intent, and our review becomes an examination of the whole act."). The preamble to the ADTPA's enacting legislation reveals that the legislature's remedial purpose ·was "to protect the interests of both the consumer public and the legitimate business community[.]" *State ex rel. Bryant v. R & A Inv. Co.*, 336 Ark. 289, 295, 985 S.W.2d 299, 302 (1999). Remedial legislation should be liberally construed. *Schultz v. Rector–Phillips–Morse, Inc.*, 261 Ark. 769, 778, 552 S.W.2d 4, 9 (1977). The general-activity rule would undermine the ADTPA's purpose by exempting all conduct subject to regulation by a state or federal regulator; virtually all conduct is regulated in some way, and the general-activity rule would essentially read the ADTPA out of existence. Viewing the ADTPA as a whole, we believe that the specific-conduct rule is consistent with the broad remedial purposes of the act.

Finally, in Act 986 of 2017, the General Assembly amended the safe-harbor provision to add the word· "specifically" ·before the word "permitted." This clarification by the General Assembly followed the federal courts' interpretation of ·our decision in *Arloe Designs, ·LLC· v. Arkansas Capital Corp.*, 2014 Ark. 21, 431 S.W.3d 277, as indicating that Arkansas followed the general-activity rule. ·*See Gabriele v. ConAgra Foods, Inc.*, No. 5:14-CV-05183, 2015 WL 3904386, at'*7 (W.D. Ark; June 25, 2015) (citing *Arloe* and stating ·that "[c]onsistent with the plain language of the ADTPA, it appears that the Arkansas Supreme Court recognizes and applies the so-called general-activity rule. In other words, the safe-harbor provision exempts regulated conduct by regulated actors regardless of whether substantive state law explicitly authorizes or prohibits the precise conduct at issue."); *Tuohey v. Chenal Healthcare, LLC*, 173 F.Supp.3d 804, 809 (E.D. Ark. 2016) ("[T]he Arkansas Supreme Court did not make an inquiry into the specific conduct of the defendants in *Arloe* . . . . The safe-harbor provision precludes actions pursuant to the ADTPA against regulated entities engaged in regulated conduct."). The General Assembly is presumed to be familiar with this court's interpretations of its statutes, and if it disagrees it can amend the statutes. *Lawhon Farm Servs. v. Brown*, 335 Ark. 272, 281, 984 S.W.2d 1, 5 (1998). Here, the addition of the word "specifically" is a clear indication that the General Assembly intended Arkansas to follow the majority specific-conduct rule.

Based on our rules of statutory construction, we hold that the ADTPA's safe-harbor provision should be applied according to the specific-conduct rule, meaning that it precludes claims only when the

actions or transactions at issue have been specifically permitted or authorized under laws administered by a state or federal regulatory body or officer.

Certified questions reformulated and answered.

Special Justice Robert M. Veach joins in this opinion.

Baker, J., dissents.

Kemp, C.J., not participating.

Karen R. Baker, Justice, dissenting.

Because the majority has failed to follow our rules of statutory construction in interpreting Ark. Code Ann. § 4–88–101(3), I dissent from the majority opinion.

Our standard is clear. The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Potter v. City of Tontitown*, 371 Ark. 200, 209, 264 S.W.3d 473, 481 (2007). In our interpretation, "the statute should be construed so that no word is left void, superfluous, or insignificant; and meaning and effect must be given to every word in the statute if possible. *Locke v. Cook*, 245 Ark. 787, 793, 434 S.W.2d 598, 601 (1968)." *Kildow v. Baldwin Piano & Organ*, 333 Ark. 335, 339, 969 S.W.2d 190, 192 (1998). However, "when a statute is ambiguous, . . . we must interpret it according to the legislative intent, and its review becomes an examination of the whole act." *Johnson v. Dawson*, 2010 Ark. 308, at 5, 365 S.W.3d 913, 916; *see also MacSteel Div. of Quanex v. Ark. Okla. Gas Corp.*, 363 Ark. 22, 30, 210 S.W.3d 878, 883 (2005) (observing "that this court will not read into a statute a provision that simply was not included by the General Assembly"). In sum, "the basic rule of statutory construction is to give effect to the intent of the legislature."

*Ark. Dep't of Human Servs. v. Howard*, 367 Ark. 55, 62, 238 S.W.3d 1, 6 (2006). Here, pursuant to the plain language of the statute as well as the statute's legislative history, the general-activity rule should be applied.

First, based on the plain language of the statute, I would hold that the "safe harbor" provision of the ADTPA employs the general-activity rule. The plain language provides that the ADTPA does not apply to actions or transactions permitted under laws administered by the Insurance Commissioner, unless the Director of the Insurance Commission specifically requests the Attorney General to implement the powers of this chapter. From the plain language of the statute, it is evident that section 4–88–101(3) has two components: (1) the statute provides a safe harbor for actions regulated by state and federal regulators, (2) the statute then provides a mechanism for the State, through the Attorney General, to implement the Act, when the director of one of the regulatory agencies requests the State to implement the Act. In other words, to pursue a claim under the ADTPA, if the general activity is regulated by a state or federal agency, the "safe harbor" applies unless the director of the regulated agency seeks implementation of ADTPA from the Attorney General. Thus, there must be an overt act to trigger that the "safe harbor" protection does not apply to the conduct. Accordingly, based on the plain language of Ark. Code Ann. § 4–88–101(3), the statute refers to the general conduct of a regulated entity by a state or federal agency. To interpret the statute otherwise would render the statute meaningless, because this court must interpret the entire statute—including the second portion of the statute—which the majority fails to do. To read the statute as the majority has interpreted it would read that the Insurance Commission has authorized the specific conduct and

then the Insurance Commission, the same agency, having approved the conduct, would request the Attorney General to challenge the conduct that the agency had already approved. This is nonsensical. The only way for the majority to interpret the statute to mean that the specific-activity rule applies, it must ignore the latter portion of the statutory language which this court cannot do. Finally, the majority fails to recognize that if the General Assembly meant to use the word "specifically" as it relates to the permitted activities, it would have used the word because the General Assembly used the word in the statute. Since the statute's inception in 1971, the General Assembly used the word "specifically" but not where the majority asserts "specifically" should now be read. The plain language provides that actions or transactions are permitted under laws administered by the Insurance Commissioner unless a director of these divisions *specifically* requests the Attorney General to implement the powers of this chapter. The word "specifically" is used to indicate that the head of the agency, here, the Insurance Commission, must specifically request to challenge the conduct. Second, based on the statute's legislative history, I would also hold that the general-activity rule should be applied. Although the majority does not recognize that the court only looks to the legislative history once the language at issue is found to be ambiguous and simply reaches to the legislative history to support its position; the legislative history does not support the majority's holding. See *Johnson v. Dawson*, 2010 Ark. 308, at 4–5, 365 S.W.3d 913, 916 (internal citations omitted) ("When the language is plain and unambiguous, there is no need to resort to rules of statutory construction, and the analysis need go no further. When a statute is ambiguous, however, we must interpret it according to the legislative intent, and our review becomes an examination of the whole act."). Rather, employing a review of the legislative history leads me to the conclusion that the general-activity rule should be applied.

Here, the parties have taken competing positions on the interpretation of the statute and assert a conflict in our holdings regarding Ark. Code Ann. § 4–88–101(3) in *DePriest v. AstraZeneca Pharm., L.P.*, 2009 Ark. 547, 351 S.W.3d 168 and *Arloe Designs, LLC v. Arkansas Capital Corp.*, 2014 Ark. 21, 431 S.W.3d 277. Thus, Ark. Code Ann. § 4–88–101(3) is open to more than one interpretation. In light of this ambiguity, I would turn to the statute's legislative history. *See Harrell v. State*, 2012 Ark. 421. In reviewing the legislative history, by Act 92 of the 1971 Regular Session of the 68th General Assembly, the General Assembly enacted Title 70 "Monopolies and Trade Practices–Trademarks and Labels," Chapter 9, Consumer Protection, Section 113, "Exceptions to application of act." Ark. Stats. Ann. § 70–901 et seq. Act 92 established the Consumer Protection Division of the Attorney General's Office to provide "a strong and effective consumer protection program to protect the interests of both the consumer public and the legitimate business community." Further, Act 92 was "[a]n Act to create in the Office of the Attorney General of the State of Arkansas, a Consumer Protection Division to be Headed by a consumer counsel; to create a consumer advisory board, and to delegate authority and prescribe responsibilities appertaining thereto; to prohibit illegal, fraudulent or deceptive practices; and for other purposes." Since its enactment, the ADTPA has been amended at least eleven times: 1991, 1993, 1995, 1997, 1999, 2003, 2005, 2007, 2009, 2011, and 2017. Section 4–88–101(3) has remained the exact same until Act 986 was passed in April 2017 and went into effect August 1, 2017. The current statute was

amended with the addition in underlined text and reads as follows:

This chapter does not apply to:

. . .

(3) Actions or transactions <u>specifically</u> permitted under laws administered by the Insurance Commissioner, the Securities Commissioner, the State Highway Commission, the Bank Commissioner, or other regulatory body or officer acting under statutory authority of this state or the United States, unless a director of these divisions specifically requests the Attorney General to implement the powers of this chapter[.]

Ark. Code Ann. § 4–88–101(3)(Supp. 2017).

With this legislative history in mind, I would hold that the general-activity rule should be applied to the "safe harbor" provision of the ADTPA. Despite the General Assembly's amendment to section 4–88–101(3) in 2017, the plain language of the entire statute remains and has two components that must be read in totality. In sum, actions ₁₁permitted, meaning regulated, by a state or federal agency fall within the realm of "safe harbor" immunity under the ADTPA unless the director of the regulatory agency requests implementation by the Attorney General.

Therefore, based on my discussion above, I would hold that the general-activity rule should apply, and I dissent from the majority opinion.