2010 Ark. App. 64

**TRI–EAGLE ENTERPRISES, Dewalt Acceptance, Inc., Randall Blythe, and Greta Blythe, Appellants**

v.

**REGIONS BANK, Appellee.**

**No. CA 09–271.**

Court of Appeals of Arkansas.

Jan. 20, 2010.

Rehearing Denied March 30, 2010.

Law Offices of James F. Swindoll, Little Rock, by: James F. Swindoll, for appellant.

Thompson and Llewellyn, P.A., Fort Smith, by: William P. Thompson; and Friday, Eldredge & Clark, LLP, Little Rock, by: Robert S. Shafer and William A. Waddell, Jr., for appellee.

M. MICHAEL KINARD, Judge.

This appeal involves a controversy over an interest-rate clause in a financing agreement executed by Tri–Eagle Enterprises and Regions Bank. The circuit court ruled that the agreement provided for a fixed-interest rate as a matter of law. Tri–Eagle and its owners and guarantors argue that the court erred in that ruling and in excluding the testimony of Tri–Eagle's expert witnesses. We reverse and remand on both points.

## I. Background Facts and Procedural History

Tri–Eagle operated a used-car business and financed its inventory through a floor-plan arrangement with Regions Bank. On February 3, 2000, Tri–Eagle and Regions executed a $1,800,000 financing agreement that contained the following clause:

> For advances for new goods, your interest rate is equal to the ~~Commercial Base Rate plus~~ *9.00% fixed* percentage points. For advances for used goods, your interest rate is equal to the ~~Commercial Base Rate plus~~ *9.00% fixed* percentage points.
>
> Your interest rate is dependent upon the Commercial Base Rate announced by Regions Financial Corp. When the Commercial Base rate changes, your rate will increase or decrease correspondingly. Your rate may change each day the Commercial Base Rate changes.

(Strike-outs in original.) All parties agree that this clause reflected a fixed, 9% interest rate, and there is no controversy regarding this document on appeal.

The relevant document for our purposes is a second floor-plan agreement executed by Tri–Eagle and Regions on April 3, 2001. The interest-rate clause in section 1.8 of that contract read as follows:

> For advances for New Goods, your interest rate is equal to the *8.25%* index rate (the "Index") plus *0 Basis Points* and for advances for Used Goods, your interest rate is equal to the Index plus *0 basis points*. When the Index changes, your interest rate will increase or decrease correspondingly. Such rate change may occur each day.

Later portions of the loan agreement defined "Index" as "the Index set forth in Paragraph 1.8."

According to Randall Blythe, the president of Tri–Eagle, he understood that the 2001 floor-plan agreement contained a var-

iable interest rate. He later realized that Regions was charging Tri–Eagle a fixed rate, and he complained to Regions on several occasions. Regions insisted that the floor-plan agreement contained a fixed-interest rate, and this conflict persisted through 2005, after which Tri–Eagle defaulted on the floor-plan agreement and other obligations to Regions.

On March 1, 2006, Regions sued Tri–Eagle for $1,676,388.56 past due on the floor-plan agreement; $305,056.24 past due on a separate promissory note; and $54,511.11 in ₃checking overdrafts. Tri–Eagle defended, in part, by asserting a set-off of $267,582.35 attributable to excess interest charged by Regions under the floor-plan agreement. Tri–Eagle also filed a counterclaim for breach of contract; constructive trust and breach of fiduciary duty; conversion; fraud; interference with prospective advantage; violation of federal banking laws; abuse of process and libel; and lender liability, based on payment of excess interest, loss of profits, and destruction of the value of its business. The circuit court dismissed the bulk of the counterclaim such that, by the time of trial, all that remained were Tri–Eagle's causes of action for breach of contract, conversion, and fraud based on Regions's charging excess interest.[1] Tri–Eagle does not argue on appeal that the pretrial dismissals were in error.

At trial, Regions's witnesses testified that the 2001 floor-plan agreement contained a fixed interest rate rather than a variable rate. Executive Vice–President David Cravens, commercial loan officer Larry Randall, and former loan officer Jason Anderson explained that the term "index," which was used in the agreement, generally indicates a variable rate calculated on a fluctuating benchmark, such as the

prime rate or the London Interbank Offered Rate (LIBOR). However, they said, the "index" in Tri–Eagle's agreement was fixed at 8.25% and, consequently, no mechanism existed to vary that rate. They concluded, therefore, that it was a fixed rate. David Cravens also testified that Regions intended for the floor-plan agreement to contain a fixed rate, citing statements made in various bank memoranda and meeting minutes regarding the 2001 agreement.

₄On cross-examination, Regions's witnesses admitted that the 2001 floor-plan agreement did not contain the word "fixed" and they acknowledged that the agreement's language provided that the interest rate could change daily. However, they explained that this was the result of the bank's using the same loan-document form for both variable and fixed-rate loans.

Tri–Eagle presented testimony by Randall Blythe, who said that his loan officer told him that they would use a variable rate on the 2001 financing agreement. Blythe stated that he interpreted the interest-rate clause as reflecting a variable rate, based on the wording of the document. Tri–Eagle also called Dale Hepworth, a former Regions employee, who said that, although he was not suggesting that the 2001 floor plan contained a variable interest rate, the use of the term "index" was inconsistent with a fixed rate. Tri–Eagle additionally proffered the testimony of two expert witnesses, Dan Wojcik and Michael Woody, who interpreted the 2001 floor plan as having a variable interest rate. The circuit court excluded Wojcik's and Woody's testimony, based on Regions's arguments that the experts were

---

1. The circuit court would later allow Tri–Eagle to submit a fraud claim to the jury based on matters other than excess interest charges. The jury rejected Tri–Eagle's claim.

not qualified and their opinions were unreliable.

At the close of the evidence, Regions moved for a directed verdict, asking the circuit court to interpret the 2001 interest-rate clause as unambiguously containing a fixed rate. The court did so, and instructed the jurors that they would hear no further evidence or arguments regarding overpayment of interest. Thereafter, the court submitted Regions's claims for the amounts due on the floor plan, the promissory note, and checking overdrafts to the jury. The court also submitted a claim by Tri–Eagle for fraud related to matters other than the interest rate. Following deliberations, the jury awarded Regions $1,593,921.41 due on the 2001 floor plan; $377,855.72 due on a promissory note; and nothing for checking overdrafts. The jury also awarded Tri–Eagle nothing on its fraud claim. The circuit court entered judgment on December 4, 2008, and Tri–Eagle filed a timely notice of appeal. Tri–Eagle now argues that the court erred in ruling that the 2001 floor plan unambiguously contained a fixed interest rate and that the court abused its discretion in excluding the testimony of Tri–Eagle's expert witnesses.

## II. Interpretation of the Interest–Rate Clause

■ The circuit court ruled that the following language in the 2001 floor-plan agreement unambiguously reflected a fixed interest rate:

For advances for New Goods, your interest rate is equal to the *8.25%* index rate (the "Index") plus *0 Basis Points*

and for advances for Used Goods, your interest rate is equal to the Index plus *0 basis points*. When the Index changes, your interest rate will increase or decrease correspondingly. Such rate change may occur each day.

Tri–Eagle contends that the rate was unambiguously variable or, alternatively, that the meaning of the clause presented a factual question for the jury.[2]

■ When a contract is free of ambiguity, its construction and legal effect are questions of law for the court to determine. *Roberts Contracting Co. v. Valentine–Wooten Rd. Pub. Facility Bd.*, 2009 Ark. App. 437, 320 S.W.3d 1. When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed. *Fryer v. Boyett*, 64 Ark.App. 7, 978 S.W.2d 304 (1998). However, when ambiguous language is used in the contract, other rules apply. Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one equally reasonable interpretation. *Roberts Contracting, supra*. The determination of whether ambiguity exists is ordinarily a question of law for courts to resolve. *Id.* The court may also interpret an ambiguous contract as a matter of law when the ambiguity can be resolved by reference to the contract language itself. *See Zulpo v. Farm Bureau Mut. Ins. Co.*, 98 Ark.App. 320, 255 S.W.3d 494 (2007). But, when a contract is ambiguous as to the intent of the parties, and the meaning of the language depends on disputed extrinsic evidence, the issue is a question of

**2.** Tri–Eagle originally argued to the circuit court that the floor-plan interest rate was unambiguously variable and that no parol evidence should be admitted on the issue. However, during trial, Tri–Eagle expressly asked the court to submit the issue of the meaning of the interest-rate clause to the jury. Tri–Eagle therefore has not abandoned its arguments regarding the existence of a factual question or the need for expert testimony, as Regions suggests.

fact for the jury. *Perry v. Baptist Health,* 358 Ark. 238, 189 S.W.3d 54 (2004). *See also Minerva Enters., Inc. v. Bituminous Cas. Corp.,* 312 Ark. 128, 851 S.W.2d 403 (1993).

■ In the present case, the language in the 2001 interest-rate clause is ambiguous and its meaning presents a factual question. Unlike the 2000 agreement, which used the term "fixed" with regard to the interest rate, the 2001 agreement omits that term, thus rendering the nature of the interest rate unclear and susceptible to more than one equally reasonable interpretation. The agreement does recite an 8.25% "index rate" for new goods. However, it simply mentions an "index rate" for used goods. Further, even if the mention of a specific, 8.25% figure constitutes a fixed interest rate—and it may not, given the evidence at trial that an "index" usually indicates a variable rate—the clause makes unmistakable references to the possibility of a varying rate, i.e., "when the Index changes, your interest rate will increase or decrease correspondingly" and "such rate change may occur each day." Regions's witnesses explained that the contract's use of a set rate rather than a fluctuating rate as an "index" meant that the rate could never vary. Regions's point is well taken but, given the language of the interest-rate clause as a whole, we cannot say that it renders the clause unambiguous as a matter of law. Rather, Regions's explanation constitutes precisely the type of useful, extrinsic evidence that a fact-finder could utilize in interpreting the clause. The same is true of Regions's evidence that it intended that the rate be fixed, as shown by its own memoranda and meeting minutes, and Regions's evidence that the interest-rate clause contained "variable" language because the floor-plan agreement was drafted on a form used for both fixed and variable-rate loans. These

matters, along with Tri–Eagle's evidence—including, as we will explain shortly, the testimony of Tri–Eagle's experts—should have been submitted to the fact-finder as criteria for resolving the meaning of this ambiguous interest-rate clause. *See McGrew v. Farm Bureau Mut. Ins. Co.,* 371 Ark. 567, 268 S.W.3d 890 (2007); *see also Alexander v. McEwen,* 367 Ark. 241, 239 S.W.3d 519 (2006). The circuit court therefore erred in granting a directed verdict rather than submitting the question to the jury.

■ Tri–Eagle argues that if the contract is determined to be ambiguous, it must be interpreted against the drafter, which is Regions. While this is often true, especially in insurance cases, the rule does not apply in situations such as the present one where disputed extrinsic evidence is offered to establish what the ambiguous language means. *See State Auto Prop. & Cas. Co. v. Ark. Dep't of Envtl. Quality,* 370 Ark. 251, 258 S.W.3d 736 (2007). In those instances, a factual question exists precluding a directed verdict. *See id.*

### III. *Expert Witnesses*

■ At trial, Tri–Eagle proffered the testimony of Dan Wojcik and Michael Woody, who opined that the 2001 floor-plan agreement should be interpreted as having a variable rate. The circuit court conducted a thorough, line-by-line examination of Wojcik's and Woody's depositions, then rejected their testimony. With regard to Wojcik, the court stated that Wojcik had not analyzed Tri–Eagle's financial statements, that he lacked training in floor planning or contract interpretation, and that "his opinion is just based on his experience." With regard to Woody, the court determined that Woody was not familiar with floor-plan banking standards in Arkansas, that he did not talk with other

bankers, that his opinion was not peer-reviewed, that he did not consider the intent of the contracting parties, and that he had no experience in construing contracts. Tri–Eagle argues that Wojcik's and Woody's testimony should have been admitted. We review the circuit court's evidentiary ruling for an abuse of discretion. *Green v. Alpharma, Inc.*, 373 Ark. 378, 284 S.W.3d 29 (2008).

The general test of admissibility of expert testimony is whether it will assist the trier of fact in understanding the evidence or determining a fact in issue, and whether some reasonable basis exists for demonstrating that the witness has knowledge of the subject beyond that of ordinary knowledge. *See Turbyfill v. State*, 92 Ark.App. 145, 211 S.W.3d 557 (2005). *See also Arrow Int'l, Inc. v. Sparks*, 81 Ark.App. 42, 98 S.W.3d 48 (2003). Rule 702 of the Arkansas Rules of Evidence provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

There is a decided tendency to permit the fact-finder to hear the testimony of persons having superior knowledge in a given field unless they are clearly lacking in training and experience. *Arrow Int'l, supra.* Further, an expert witness need not be a specialist as long as he or she exhibits knowledge of the subject. *Fryar v. Touchstone Phys. Therapy, Inc.*, 365 Ark. 295, 229 S.W.3d 7 (2006). Absolute expertise concerning a particular subject is not required to qualify a witness as an expert. *Graftenreed v. Seabaugh*, 100 Ark.App. 364, 268 S.W.3d 905 (2008). Moreover, no firm rule can be derived to serve uniformly as a means of measuring the qualifications of an expert, and too rigid a standard should be avoided. *See Dildine v. Clark Equip. Co.*, 282 Ark. 130, 666 S.W.2d 692 (1984).

In this case, we commend the circuit court's meticulous review of the experts' depositions. However, we must conclude that the court abused its discretion by applying too rigid a standard in excluding the experts' testimony. Mr. Wojcik's curriculum vitae reflects his thirty-five-year career in international, commercial, and retail banking, which included his service as president of National Bank of Arkansas from 2000 to 2005, senior vice president of Mercantile Bank in Arkansas from 1997 to 2000, and as a bank executive in Texas and Indiana. He possessed an MBA from Indiana University and graduated from two banking schools. According to Wojcik's deposition, his schooling provided him with no training regarding automobile floor-plan financing or contract interpretation, but he had practical experience with floor-plan financing for automobile dealerships and oversaw floor-plan lending during his tenure at Mercantile Bank. Mr. Woody also had thirty-five years' experience as a banker. He served as CEO and president of several banks and held high positions in others. He also held faculty positions in banking at numerous universities and performed eighty educational presentations per year to bankers, lawyers, and CPAs, including presentations in Arkansas. Though Woody stated in his deposition that he had not taught a class on floor planning per se, he stated that he had practical experience as a floor-plan lender for used cars and that he had taught "generalities relating to floor plan financing in Arkansas." Woody stated further that he had not attempted to determine standards for floor-plan banking in Arkansas because such

standards were "universal." He also testified that he based his interpretation of the parties' floor-plan agreement on the document itself and not on the parties' intentions. Woody's curriculum vitae contains numerous instances of his expert testimony having been given between 2000 and 2007.

As shown by the above, these witnesses possessed greater-than-ordinary knowledge of floor-plan lending and banking in general and could have assisted a factfinder in interpreting this ambiguous interest-rate clause. Both witnesses were veteran bankers with practical experience in commercial lending and floor-plan financing, and they were no strangers to Arkansas banking practices. Wojcik had been an Arkansas banker, and Woody had conducted banking training sessions in Arkansas. Though neither man professed to be an expert in contract interpretation, that does not disqualify their testimony. They had superior knowledge to offer the jury gained from their experience in the commercial banking industry. It remained the jury's prerogative to interpret the contract, with the aid of the experts. Ark. R. Evid. 702, 704.

We also must address the court's concern that the experts' opinions were based merely on their experience. That concern was not well founded. Arkansas Rule of Evidence 702 recognizes that an expert's testimony may be based on experience in addition to knowledge and training. *Arrow Int'l, supra.* Similarly, the circuit court's reservations about the quality of the witnesses' knowledge and training should go to the weight of their testimony and not to its admissibility. *See Miller Brewing Co. v. Ed Roleson, Jr., Inc.,* 365 Ark. 38, 223 S.W.3d 806 (2006); *Coca–Cola Bottling Co. v. Gill,* 352 Ark. 240, 100 S.W.3d 715 (2003).

The circuit court was also troubled by the fact that one witness's opinion had not been "peer reviewed." That type of review was not necessary in this case. The peer-review requirement stems from the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which our supreme court adopted in *Farm Bureau Mutual Insurance Co. v. Foote,* 341 Ark. 105, 14 S.W.3d 512 (2000). Under *Daubert,* a trial court, when presented with novel scientific evidence from an expert witness, must perform a gate-keeping function in order to determine if the reasoning behind the evidence is scientifically valid and can be applied to the facts of the case. *Turbyfill, supra; Arrow Int'l, supra.* One of the factors bearing on the reliability of novel scientific evidence is whether the expert's theory or technique has been subject to peer review. *Alpharma, supra.* However, in the case at bar, the experts' opinions did not depend on novel scientific evidence; thus, no *Daubert* review was required.

In the later case of *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court held that a *Daubert* inquiry may be made (but is not required to be made) in cases involving technical or other specialized knowledge in addition to scientific knowledge. However, our court has held that a *Daubert* or *Kumho* analysis is not required where expert testimony is based on experience, observations, and knowledge garnered by the expert rather than methodology. *Turbyfill, supra; Arrow Int'l, supra.* That is the situation here. The experts offered their opinions based on experience within the banking field (which is governed by generally accepted banking practices), which dispensed with the need for a *Daubert/Kumho* assessment involving peer review.

■ Finally, we address a statement made by Regions's counsel during oral argument regarding expert Michael Woody. Counsel stated that Woody had been disqualified as an expert in a federal-court case in Mississippi. We have reviewed the federal court's ruling, *Berhow v. Peoples Bank*, 2006 WL 839529 (S.D.Miss.2006), and we conclude that Woody's disqualification there was based on the particular facts and law involved in that case, which are not applicable here.

### IV. *Disposition on Appeal*

Having found reversible error, we have struggled with the question of how to instruct the parties and the circuit court upon remand. Our task is complicated by the fact that Tri–Eagle presented its arguments on appeal regarding the two assignments of error without seeking a particular remedy. Regions contends that, because Tri–Eagle's arguments did not "attach" to anything, they are abstract and academic and do not warrant reversal. In contrast, Tri–Eagle claimed during oral argument that any errors by the circuit court affected the lawsuit in its entirety and appeared to seek a retrial of the whole case. Our disposition lies between these two extremes.

■ Initially, we reject Regions's notion that Tri–Eagle's arguments are abstract. Clearly, the arguments relate to Tri–Eagle's defense and counterclaims for excess interest payments, which were distinct aspects of the case below. However, we cannot agree with Tri–Eagle that a complete retrial is in order. Tri–Eagle has not argued on appeal that the verdicts in favor of Regions were unsupported by substantial evidence or that any error occurred as to the pretrial dismissal of several counts of its counterclaim. Rather, Tri–Eagle's arguments, on the whole, focus on the limited issue of the interest-rate clause as it pertains to a claim for excess interest payments. It is an appellant's burden to demonstrate and explain reversible error. *See Parker v. Parker*, 97 Ark.App. 298, 248 S.W.3d 523 (2007); *Arrow Int'l, supra.* Arguments not made on appeal are considered abandoned. *DePriest v. AstraZeneca Pharms.*, 2009 Ark. 547, 351 S.W.3d 168; *Alvarado v. St. Mary–Rogers Mem. Hosp.*, 99 Ark.App. 104, 257 S.W.3d 583 (2007); *Dalrymple v. Dalrymple*, 74 Ark.App. 372, 47 S.W.3d 920 (2001). Under these circumstances, Tri–Eagle should not receive a remedy that goes beyond the issues argued on appeal. We therefore reverse and remand with instructions for a retrial solely of Tri–Eagle's causes of action pertaining to the charging of excess interest. *See First Commercial Trust Co. v. Rank*, 323 Ark. 390, 915 S.W.2d 262 (1996); *Am. Health Care Providers, Inc. v. O'Brien*, 318 Ark. 438, 886 S.W.2d 588 (1994); *Schmidt v. Stearman*, 98 Ark.App. 167, 253 S.W.3d 35 (2007) (ordering a retrial of fewer than all counts of a multicount case). We emphasize that any expert testimony offered by Tri–Eagle on retrial must be limited to this issue as well. We anticipate that the retrial will entail a factual determination of the meaning of the interest-rate clause and, if necessary, the amount of excess interest paid by Tri–Eagle.

Reversed and remanded.

ROBBINS and GRUBER, JJ., agree.