Cite as 2019 Ark. App. 371

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-18-301

|  |  |
|---|---|
| | **Opinion Delivered:** September 11, 2019 |
| FIVE FORKS HUNTING CLUB, LLC **APPELLANT** | APPEAL FROM THE ARKANSAS COUNTY CIRCUIT COURT, NORTHERN DISTRICT [NO. 01SCV-15-6] |
| V. | |
| NIXON FAMILY PARTNERSHIP **APPELLEE** | HONORABLE DAVID G. HENRY, JUDGE |
| | AFFIRMED |

## KENNETH S. HIXSON, Judge

Five Forks Hunting Club, LLC (Five Forks or appellant), brings this appeal from a judgment of the Arkansas County Circuit Court awarding the Nixon Family Partnership (Nixon or appellee) two separately defined prescriptive easements across the property of Five Forks, one by land used occasionally for ingress and egress by vehicle travel, referred to as the "road easement," and the other by water through a ditch used at times for ingress and egress by boat, referred to as the "boating easement." Five Forks argues five points, contending that the circuit court erred (1) by awarding a prescriptive easement for boat travel; (2) by awarding Nixon multiple prescriptive easements; (3) in finding that the elements of a prescriptive easement were supported by the evidence; (4) by allowing Nixon to delimit the boating easement; and (5) in not imposing reasonable boating restrictions. We affirm.

## I. *Introduction*

This is duck hunting country. The parties are adjoining landowners in Arkansas County. The Nixon property is located to the northeast of Five Forks' property. The parties share a common boundary for a quarter-mile along Five Forks' north line (and Nixon's south line) and for another quarter-mile along Five Forks' east line (and Nixon's west line). Each property extends into the Bayou Meto Wildlife Management Area (BMWMA). Each party uses its land primarily for duck hunting. Nixon[1] gains ingress and egress to its property by traversing a road and a ditch situated across the Five Forks property. Five Forks seeks to prevent, or substantially limit, Nixon from traversing the Five Forks property. Hence, the conflict. The issue below was whether Nixon created a prescriptive easement(s) over the road and ditch as it crosses the Five Forks property.

## II. *Relevant Facts*

### A. Five Forks Hunting Club, LLC

The property now known and referred to as the Five Forks property was previously and commonly known as the "Coca Cola Property" and contains approximately 480 acres in Section 28. According to Richard Metcalf, a member of Five Forks, certain individuals purchased the Coca Cola Property in 1998. Then, in February 1999, those individuals transferred ownership of the property to Five Forks.

---

[1]The term "Nixon" herein includes the Nixon Family Partnership, Big Coon Hunting Club (Big Coon), and lessees.

## B. The Nixon Family Partnership

The Nixon Family Partnership is a limited liability partnership that owns approximately 160 acres located in Section 21. According to Ruth Vanlear Nixon Light, Nixon derived title to its property through the maternal grandfather of its members, Mr. E.A. Matthews, who acquired the property in 1951. The only testimony concerning the Nixon property, the Coca Cola Property, or the relationship between the predecessors in title came from Mrs. Light who testified, "Most of what I know about the early part of the property comes from my dad [David Nixon, Sr.] and he also told us that we always had the right to use the road and the ditch." Unfortunately, David Nixon, Sr., passed away prior to this litigation. Obviously, Mrs. Light's testimony is inconclusive as to whether the right to use the road and the ditch as it passed through the Coca Cola Property was permissive, adverse, or prescriptive. Beginning in 1991, Nixon leased its property to John Godwin for duck hunting. Godwin later became a member of Big Coon Hunting Club (Big Coon), and Big Coon has leased the property continuously from 1994 to the present. Several witnesses from Nixon and Big Coon testified that they used the road and the ditch to gain access to the Nixon property since at least 1991.

## C. The Road and the Ditch

A road and a parallel ditch enter the south line of the Five Forks property and then run in a diagonal northeasterly direction across the Five Forks property in Section 28 and enter the Nixon property on the south line of Section 21. The road and the ditch run generally parallel to one another, although the distance between them varies in spots from being immediately adjacent to a somewhat greater distance. Historically, and at least since

3

1991, as described in more detail below, Nixon has accessed its property via a combination of the road and the ditch. During dry weather, Nixon is able to drive vehicles on the road all the way across the Five Forks property and into the Nixon property. However, in wet weather, the northern portion of the road sometimes floods, which prevents Nixon from completing access to its property. Generally, when the road is flooded, the parallel ditch typically carries enough water to sustain small-boat traffic. During the times when the northern portion of the road is flooded and impassable, Nixon transfers from vehicles to boats that are stored on site in a boat shed constructed on the Five Forks property. Nixon then continues its access across the Five Forks property by boats via the ditch until it reaches the Nixon property.

Since 1998, when Five Forks first purchased the Coca Cola Property, there have been periods of peace and harmony between Five Forks and Nixon, and there have been periods during which Five Forks made some sporadic unsuccessful attempts to obstruct Nixon's use of the road and the ditch. Most recently in late 2014, which was the apparent instigator of this litigation, Five Forks built a bridge across the ditch that obstructed Nixon's use.

## D. The Litigation

On January 9, 2015, Five Forks filed suit against Nixon seeking a declaratory judgment that it has the right to control the use of the ditch, to construct and maintain the bridge across the ditch, and to enjoin Nixon and its agents and invitees from trespassing on its property by boat and from damaging the bridge. Five Forks claimed that Nixon and its invitees had only *permissive* access to its property, and although it admitted that the invitees

4

had been generally cooperative in the past, Five Forks alleged that members of Big Coon have been uncooperative and disrespectful of its property rights. It further alleged that the members of Big Coon were inconsiderate and used the ditch in a manner that would "scare away ducks and otherwise interfere with the quality of the duck hunting experience." Notably, Five Forks alleged that at least one member of Big Coon had threatened to damage the bridge that Five Forks had constructed over the ditch.

Nixon answered and filed a counterclaim seeking to establish a *prescriptive* easement over the ditch as well as the road across Five Forks' property, and to require Five Forks to remove the bridge across the ditch. Nixon later amended its counterclaim to seek a preliminary injunction to require Five Forks to immediately remove the bridge and to enjoin further obstruction of the ditch. Following a December 15, 2015 hearing on Nixon's motion for preliminary injunction, the court granted Nixon's motion and preliminarily enjoined Five Forks from maintaining the bridge and authorized Nixon to remove it.[2] Nixon subsequently removed the timbers that spanned the bridge that obstructed access to the ditch.

The case proceeded to trial in October 2016, and the circuit court considered the testimony presented at both the preliminary-injunction hearing and trial. As previously explained, because no one was alive and present to testify regarding the pre-Big Coon and Coca Cola Property period, the bulk of the testimony introduced was directed toward the use of the road and the ditch since the early 1990s.

---

[2] At the hearing, Big Coon testified that it had the equipment necessary to remove the bridge and offered to remove the bridge if so ordered by the court.

From the period commencing in 1991 through approximately 2005 there was conflicting evidence concerning the use of the road and the ditch. John Godwin individually leased the Nixon property for duck hunting beginning in 1991 and has continuously leased the property to the present. Mr. Godwin is now a member of Big Coon. Mr. Godwin testified that he and the members of Big Coon have continuously used the road and the ditch to access the Nixon property since 1991. He explained that they typically drive vehicles on the road all the way to the Nixon property unless the road is flooded and impassable. Mr. Godwin testified that Big Coon stores flat-bottom boats in a boat shed located on the Five Forks property, and when the road is flooded and impassable and there is enough water in the ditch, they would launch their boats and motor down the ditch to complete the passage to the Nixon property. Shane Bridgforth, a member of Big Coon, recalled using the ditch to access the Nixon property prior to the 1990s with his father when he was only a child. Mr. Bridgforth also testified that from 1994 forward, Big Coon regularly maintained the road and the ditch between the boat shed on Five Forks' property all the way to the Nixon property line. This maintenance of the road and ditch would include, but not be limited to, providing loads of gravel for the road, grading the road with farm equipment, filling holes, and clipping undergrowth out of the ditch.

The testimony elicited also indicated that sporadically during this period, Five Forks made some attempts to obstruct Nixon's use of the road and the ditch. In each case, Nixon promptly removed the obstructions and continued to use the ditch and the road as it had in the past. In 2000, Five Forks was not satisfied with the inconsistent collection of water on its property. Five Forks developed a plan to create a levee system on its property to facilitate

6

holding water to improve duck hunting. The construction required approval of the U.S. Army Corps of Engineers. The levee-system design included a levee that was to be built across the road and the ditch, which would have obstructed access to the Nixon property. Although the Corps initially issued a permit for the construction, Nixon later objected to the obstruction of the road and the ditch, and the Corps subsequently revoked the permit, halting construction. It was undisputed that a meeting was held among representatives of the Nixon family, Big Coon, and Five Forks. As a result of the meeting, Five Forks agreed to redesign the levee system to remove the levee that obstructed the road and the ditch. With that modification, Nixon withdrew its objection to the permit. In a written agreement memorializing the agreement to redesign the levee system, Five Forks acknowledged that Nixon claimed a *prescriptive* right to use the ditch; however, Five Forks also stated that it disputed such a claim, alleging that any use was merely *permissive*. Nevertheless, Five Forks agreed to modify the permit so that access to the road and the ditch would not be obstructed by the construction of the levee system or in any other manner.

The next significant disagreement between the parties occurred five years later in 2005. Richard Metcalf testified on behalf of Five Forks that he wrote a letter to Nixon. The 2005 letter stated that Five Forks realized that it must provide "access [to] the Nixon property by road through the center of our property when not flooded." However, Metcalf requested that members of Big Coon alter their use of the ditch and use an alternate route through Long Pond Bayou when the road is flooded during duck season (referred to herein as the "alternate route"). Nixon rejected the request, declined to alter its use, and continued to use the ditch.

That brings us to the period from 2005 to 2014. Metcalf testified that in 2014, Five Forks installed some piping across the ditch that blocked passage through the ditch. However, Five Forks removed the pipe after Nixon demanded that it do so. Metcalf then testified that in August 2015, Five Forks built a bridge that obstructed use of the ditch. It was this newly constructed bridge that prompted this lawsuit and was the subject of the preliminary hearing. Although there was some further testimony describing instances of various other natural obstructions of the ditch and the road that allegedly occurred between 2005 and 2014, including fallen trees and downed electrical lines, there were no specific dates provided as to when these events took place.

It was clear from the testimony that the road and the ditch were continuously used by Nixon without any meaningful obstructions as a means of access to its property from late 2005 until 2014. In fact, Richard Metcalf, a member and partial owner of Five Forks, admitted on cross-examination that Nixon has "continuously" used the road and that they "regularly" used the ditch when it was too wet to access the Nixon property. Moreover, members of Big Coon, including John Godwin and Shane Bridgforth, testified that the character of the road and the ditch and their use had not changed since at least 1994, as the road was used for access during dry periods and the ditch was used for boat access when there was sufficient water in the ditch and the road is under water.

Metcalf, William Wilson, and Jimmy Dill, all representatives of Five Forks, testified at trial that members of Big Coon had abused their use of the ditch by traveling unsafely and too loudly at times, scaring the ducks away. As such, they testified that if the circuit court was to grant a prescriptive easement over the ditch, such use should be restricted to

8

require boaters to use "idle speed." However, there was no testimony that anyone had complained of those issues to Nixon or Big Coon prior to this action being filed.

Representatives of Five Forks also presented testimony that Nixon and Big Coon had the ability to use an alternative route through Long Pond Bayou instead of using the ditch in wet weather. Bridgforth and Godwin denied using the ditch in an unsafe manner and testified that for various reasons they did not wish to use the proposed alternative route instead of the ditch.

Each party introduced independent surveys and the testimony of their surveyors. The main difference in the two surveys is that the Five Forks survey described two narrow fifteen-foot easements; one for the road and one for the ditch. The Nixon survey described one broad unified easement running from the west side of the road to the east side of the ditch. Recall that the road and the ditch are parallel and adjacent for much of the length of the easement. However, in some areas, the road and the ditch are several feet apart. Therefore, the Nixon survey included an area of land between the road and the ditch in the easement that was not included in the Five Forks survey.

After trial, the circuit court issued its letter opinion deciding the case on February 7, 2017, and filed a written final judgment memorializing its letter ruling on November 7, 2017. In pertinent part, the circuit court made the following findings in its final judgment:

15. From 1991 to present, the Nixon lessees have continuously used the road and ditch as a means of access to the Nixon property from their boat shed located near the South line of Five Forks property.

16. The character of the road and ditch and their use by Nixon and the Nixon lessees has not changed since at least 1991, i.e., the road is used for access during dry periods and the ditch is used (by means of flat-bottomed boats equipped with motors)

9

for access during periods when there is sufficient water in the ditch and the road is under water.

. . . .

Nixon claims a prescriptive easement over the road and ditch for access to the Nixon property. . . . Nixon and its lessees have used the road and ditch openly, continuously and adversely for well more than seven years after Five Forks (and its predecessors in title) had actual knowledge that the use was adverse to its interest.

. . . .

There was no evidence of how or exactly when the use of the road and ditch first began. Even so, Nixon's use, and that of its lessees, coupled with the facts showing that Five Forks knew that Nixon was using the road and ditch under a claim of right, is sufficient to overcome any presumption that Nixon's use, even if it began as permissive, remained so. *Fullenwider* [*v. Kitchens*, 223 Ark. 442, 266 S.W.2d 281 (1954)].

Five Forks' actual knowledge of Nixon's adverse claim, also overcomes any presumption that a passage over lands variously described as "unenclosed" (*Boullioun v. Constantine*, 186 Ark. 625, 54 S.W.2d 986, 986 (1932)), "wooded and undeveloped" (*Kimmer v. Nelson*, 218 Ark. 332, 236 S.W.2d 427 (1951)), and "wild and unimproved" (*Fullenwider v. Kitchens, supra.*) is permissive.

The court concludes that Nixon has, by a preponderance of the evidence, established a prescriptive easement over the road and ditch. And, although a prescriptive easement may be abandoned by nonuse, *Clinton Chamber of Commerce v. Jacobs*, 212 Ark. 776, 207 S.W.2d 616 (1948), Nixon has not abandoned the easement. *Fullenwider, supra.*

A central issue in this case is whether Nixon may acquire a prescriptive easement in the ditch for boat access to its property when the ditch has sufficient water. The court has not found any Arkansas cases directly on point on that issue. In *State v. McIlroy*, 268 Ark. 227, 595 S.W.2d 659 (1980), the Court found the Mulberry River to be navigable and held that the public therefore had the right to use it. In addition to the navigability issue, the appellants also raised the prescriptive easement issue, but the Court did not reach that issue because it decided the case strictly on navigability. In his dissenting opinion, Justice Fogleman disagreed with the majority's conclusion that the Mulberry was navigable, but concurred in the result by finding that the public had acquired an easement by prescription to use the river across the lands of the appellees "just as fully as they would have acquired an easement for vehicular traffic across their riparian lands by adverse use for more than seven years after appellees should have known that the public use was adverse."

10

Justice Fogleman cited *Buffalo River Conservation & Recreation Council v. National Park Service*, 558 F.2d 1342 (8th Cir., 1977) which held that cases dealing with prescriptive rights-of-way over land "apply by analogy to rights-of-way over non-navigable streams and their beds."

Although the ditch in question here is very different from a river or a stream, the court concludes that the same principle should apply.

Five Forks argues that Nixon may not acquire an easement in the ditch because the ditch is dry (or lacks sufficient water for boating) part of the time. If a roadway acquired by prescription is sometimes impassable because of flooding (as, in fact, the road is in this case), the court does not believe that would prevent the acquisition of a prescriptive easement. By analogy, the court concludes that the reverse would be true in the case of a ditch that sometimes lacks sufficient water for travel.

Both parties introduced surveys. The Five Forks survey describes the ditch and road separately by reference to specific center lines. The Nixon survey describes the ditch and road as a unified easement running from the West side of the road to the East side of the ditch. This does not necessarily present a problem North of Long Pond Bayou where the road and ditch run side by side with little, if any, distance between them. But, South of Long Pond Bayou the road and ditch follow the same general course, but are separated by much more distance. The Nixon survey therefore includes an area of land between the road and ditch in the easement. Nixon's surveyor explained his reason for describing the easement that way by analogizing it to an interstate highway system which is a single easement sometimes separated by a median.

In the case of an easement by prescription, both its creation and extent are ascertained from the adverse use of the property over a long period of time. *Jordan v. Guinn*, 253 Ark. 315, 485 S.W.2d 715 (1972). When an easement is acquired by prescription, the nature of the use cannot be changed to render it more burdensome to the servient estate than it was during the prescriptive period. *Craig v. O'Bryan*, 227 Ark. 681, 301 S.W.2d 18 (1957).

The court concludes that the prescriptive easement must be limited by the extent of Nixon's use during the prescriptive period and not expanded into a single easement as suggested by Nixon's survey. For the same reason, the court also concludes that neither the route of the easement nor the manner of its use should be altered from that established by Nixon's use, and that of its lessees, over the prescriptive period as argued by Five Forks.

Five Forks also contends that the court should impose restrictions on the use of boats in the ditch.

11

The court concludes that the manner in which the Nixon lessees have boated through the ditch has not changed over the prescriptive period. The court therefore declines to make any arbitrary boating restrictions.

(Footnotes omitted.) The circuit court additionally described the precise legal descriptions of the separate ditch and road prescriptive easements as provided by Five Forks' surveyor, which was consistent with Big Coon members' historical usage for ingress and egress to the Nixon property. Five Forks filed its notice of appeal on December 5, 2017, and this timely appeal followed.

III. *Standard of Review*

This court reviews equity matters de novo on the record but will not reverse a finding of the lower court unless it is clearly erroneous. *See Owners Ass'n of Foxcroft Woods, Inc. v. Foxglen Assocs.*, 346 Ark. 354, 57 S.W.3d 187 (2001). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id*. at 361, 57 S.W.3d at 192. In reviewing a circuit court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Carson v. Cty. of Drew*, 354 Ark. 621, 128 S.W.3d 423 (2003). Disputed facts and determinations of witness credibility are within the province of the fact-finder. *Id*. at 624−25, 128 S.W.3d at 425.

A prescriptive easement may be gained by one not in fee possession of the land by operation of law in a manner similar to adverse possession. *Carson*, 354 Ark. at 625, 128 S.W.3d at 425. Like adverse possession, prescriptive easements are not favored in the law because "they necessarily work corresponding losses or forfeitures in the rights of other

12

persons." *Id.* at 625, 128 S.W.3d at 426. In Arkansas, it is generally required that one asserting an easement by prescription show by a preponderance of the evidence that one's use has been adverse to the true owner and under a claim of right for the statutory period. *Id.*, 128 S.W.3d at 426. The statutory period of seven years for adverse possession applies to prescriptive easements. *Neyland v. Hunter*, 282 Ark. 323, 668 S.W.2d 530 (1984); *see also* Ark. Code Ann. § 18-11-106 (Repl. 2015); Ark Code Ann. § 18-61-101 (Repl. 2015). A prescriptive easement may be created only by the adverse use of privilege with the knowledge of the person against whom the easement is claimed or by use so open, notorious, and uninterrupted that knowledge will be presumed, and the use must be exercised under a claim of right adverse to the owner and acquiesced in by him. *Kelley v. Westover*, 56 Ark. App. 56, 938 S.W.2d 235 (1997). We recently have affirmed that there was sufficient continuous use when the use was found to be "more than fitful, irregular, occasional." *Carroll v. Shelton*, 2018 Ark. App. 181, at 7, 547 S.W.3d 94, 99.

IV. *Appellant's Arguments on Appeal*

The appellant sets forth five separate points on appeal. We will address each of these points; however, for sake of clarity, we will address the points in a different order.

A. The Circuit Court Erred as a Matter of Law
by Awarding a Prescriptive Easement for Boat Travel

Five Forks first argues that the circuit court erred as a matter of law by awarding Nixon a prescriptive easement for boat travel. When one drills down into Five Forks' argument, its argument is actually that there is no precedent upon which an Arkansas court can create a prescriptive easement over a ditch or a waterway. It further argues that the circuit court's decision concluding that Nixon has a prescriptive easement in the ditch works

13

a significant change in the law that should come only by legislation. Nixon, on the other hand, argues that a prescriptive easement can include a ditch or a waterway and that this is not a change in Arkansas law.

Our first query is to determine whether a person or entity can be awarded a prescriptive easement over a ditch or a waterway,[3] regardless of its scope. If that answer is "no," the analysis is concluded, and the court erred in doing so. However, if the answer is "yes," then, the next query is whether Nixon proved the essential elements of a prescriptive easement. In *Hodge v. City of Marmaduke*, 255 Ark. 789, 503 S.W.2d 174 (1973), Mr. Hodge owned land that contained a ditch along a highway. For forty years, the City of Marmaduke discharged surface water into the ditch. Mr. Hodge admitted that the City had obtained a prescriptive easement over his ditch. Later, the City constructed a new sewage system that included a lagoon. The sewage lagoon was located across the highway from Mr. Hodge's property. The City installed a pipe underneath the highway and discharged the treated effluent into the ditch. This continued for ten years. Apparently, the lagoon reached its treatment capacity, and the effluent that was being discharged into Mr. Hodge's ditch was no longer acceptedly treated effluent. Mr. Hodge filed a lawsuit against the City to enjoin the City from discharging the offending effluent into his ditch. The chancellor refused to issue the requested injunction, finding that the City had acquired a prescriptive right to the use of the ditch for the discharge of effluent. In affirming the chancellor, our supreme court stated the following:

> We consider first the city's asserted prescriptive right to use the drainage ditch as an outlet for its treatment plant. Although there are comparatively few cases

---

[3]We use the term "waterway" in its most generic sense.

14

involving the acquisition of a flowage easement by adverse use, the parties are not in disagreement about the law. The basic principles of adverse possession are applicable. As the Nebraska court said in *Courter v. Maloley*, 41 N.W.2d 732 (Neb. 1950): 'That an easement may be acquired by prescription for the flow of waters there can be no doubt. Such an easement however cannot be acquired except by open, notorious, exclusive, and adverse use for a period of ten years.' (In Arkansas the period is only seven years.)

*Hodge*, 255 Ark. at 791, 503 S.W.2d at 175.

In finding that Nixon has a prescriptive easement in the ditch, the circuit court relied in part on *Buffalo River Conservation & Recreation Council v. National Park Service*, 558 F.2d 1342 (8th Cir. 1977). In *Buffalo River*, riparian landowners sued the federal government to halt the creation of a national park along the Buffalo River. There was proof that canoeists had floated the Buffalo River for many years. The flotation had been open and ever-increasing in intensity and open and adverse for more than the seven years required by Arkansas law for the establishment of a prescriptive public easement over the course of the stream and its bed. The district court found that the public had acquired a prescriptive right to float down the river and that the landowners could fence off their shore lines, but could not obstruct the river. In affirming, the Eighth Circuit held that the lower court's decision was supported by the evidence. The court also said, "While the cases cited[4] deal with prescriptive rights-of-way over land, we agree with the trial court that they apply by analogy to rights-of-way over non-navigable streams and their beds." 558 F.2d at 1345. Hence,

---

[4]The district court cited *Clinton Chamber of Commerce v. Jacobs*, 212 Ark. 776, 207 S.W.2d 616 (1948); *McLain v. Keel*, 135 Ark. 496, 205 S.W. 894 (1918); *Patton v. State*, 50 Ark. 53, 6 S.W. 227 (1887); *Howard v. State*, 47 Ark. 431, 2 S.W. 331 (1886). The Eighth Circuit added its own citations: *Weigel v. Cooper*, 245 Ark. 912, 436 S.W.2d 85 (1969); *Fullenwider v. Kitchens*, 223 Ark. 442, 266 S.W.2d 281 (1954).

15

*Hodge* and *Buffalo* stands for the proposition that a prescriptive easement can exist over a ditch.

Here, Five Forks does not explain why an easement by prescription for boat travel cannot exist over a ditch or other waterway. Nor does it cite to any cases rejecting a prescriptive easement over a waterway. It also does not argue that *Buffalo River*'s analogy to rights-of-way over land is wrong. Instead, its argument on this point is that such a significant change in the Arkansas law of easements should wait for legislation. It is an appellant's burden to demonstrate and explain reversible error. *See Fayetteville Express Pipeline, LLC v. Ark. Pub. Serv. Comm'n*, 2017 Ark. App. 557, 533 S.W.3d 106; *Tri-Eagle Enters. v. Regions Bank*, 2010 Ark. App. 64, 373 S.W.3d 399. Moreover, our supreme court has stated that any vehicle that would be needed for the maintenance or operation of the easement could be driven across the servient estate. *See Loyd v. Sw. Ark. Utils. Corp.*, 264 Ark. 818, 825, 580 S.W.2d 935, 938 (1979). By this statement, a boat could be used to access the easement. Therefore, we conclude that a prescriptive easement may be created over a ditch or waterway.[5]

---

[5]The only other substantive argument Five Forks makes under this heading is that, by focusing on navigability, the supreme court in *State v. McIlroy*, 268 Ark. 227, 595 S.W.2d 659 (1980), rejected the theory of a prescriptive easement for boat travel found in Justice Fogleman's separate opinion. We disagree. The court in *McIlroy* actually stated that it was not addressing the other arguments on appeal, including the prescriptive easement for boat travel. 268 Ark. at 230, 595 S.W.2d at 661. Thus, *McIlroy* left open the question of whether a prescriptive easement could be obtained over a waterway.

## B. The Circuit Court Erred in Finding that
## Nixon Had Proved the Elements of a Prescriptive Easement

Since we have concluded that a prescriptive easement may be created over a ditch or waterway, we move to appellant's next point on appeal that the circuit court erred in finding that Nixon had proved the elements of a prescriptive easement. A prescriptive easement may be created only by the adverse use of privilege with the knowledge of the person against whom the easement is claimed or by use so open, notorious, and uninterrupted that knowledge will be presumed, and the use must be exercised under a claim of right adverse to the owner and acquiesced in by him. *Kelley*, *supra*. And, the statutory period of seven years for adverse possession applies to prescriptive easements. *Neyland*, *supra*. Further, mere permissive use of an easement cannot ripen into an adverse claim without clear action that places the owner on notice. The plaintiff bears the burden to show by a preponderance of the evidence that there has been adverse, not permissive, use of the land in question, *Carroll*, 2018 Ark. App. 181, at 6, 547 S.W.3d at 99.

Much of Five Forks' argument under this point on appeal is focused on the sufficiency of the prescriptive easement over the ditch. However, Five Forks does also appear to cursorily challenge the sufficiency of the prescriptive easement over the road. Specifically, Five Forks argues that Nixon's use of the ditch and the road was not "continuous" or "uninterrupted" for the required period. A circuit court's finding with respect to the existence of a prescriptive easement will not be reversed by this court unless it is clearly erroneous. *Johnson v. Jones*, 64 Ark. App. 20, 977 S.W.2d 903 (1998); *Kelley*, *supra*. Although Five Forks argued below that Nixon's use of its property was permissive and not adverse, Five Forks does not specifically make this argument on appeal. Nor does

it challenge the other elements. It is axiomatic that arguments made below but not argued on appeal are deemed abandoned, and we do not address the sufficiency of these elements in this opinion. *Early v. Crockett*, 2014 Ark. 278, at 16 n. 7, 436 S.W.3d 141, 151 n. 7; *Vibo Corp. v. State ex rel. McDaniel*, 2011 Ark. 124, 380 S.W.3d 411. Thus, we address the allegation of lack of continuity over the ditch and road easements.

## 1. *The ditch easement*

Five Forks argues that Nixon's "sporadic seasonal use [of the ditch] shown by the evidence" failed to meet the legal standard of prescriptive easements for the "continuous use" element for the required seven-year period. Five Forks explains that the proof showed that there were periods when there was insufficient water in the ditch to allow for boat access to the Nixon property. The parties agree that since 1991, in some years the road did not flood, and therefore, Nixon did not use the ditch for access. Further, there was certainly no disagreement that in the many periods during which the road flooded and when there was sufficient water in the ditch, Nixon did, in fact, use the ditch for access. Five Forks cites the example that during the 2015−16 duck season there was sufficient water in the ditch only during the last few days of the duck-hunting season. Five Forks contends that such irregular or intermittent use does not constitute "continuous" as required by adverse possession. Five Forks cites *Horton v. Taylor*, 2012 Ark. App. 469, 422 S.W.3d 202, for the proposition that irregular or intermittent use cannot establish the continuity necessary for an easement. However, Five Forks' reliance on *Horton* is misplaced. In *Horton*, the proof showed that the appellant claiming the easement used the property daily for a period of approximately three to four years for the operation of a sawmill. The only proof of use in

18

other years was the occasional use by hunters. We affirmed the circuit court's conclusion that this was insufficient to establish a prescriptive easement.

We believe *Carroll*, *supra*, is more authoritative and persuasive to the case at bar. In *Carroll*, Ms. Shelton claimed a prescriptive easement for parking vehicles on Carroll's property. Shelton offered several witnesses who testified that Shelton, her family, and her friends parked on the easement consistently over a combined period of almost thirty years. In opposition, Carroll offered witnesses who testified that any such parking was very sporadic. Carroll argued that Shelton's sporadic parking over the years was not "continuous" and failed to satisfy the elements of a prescriptive easement. The circuit court found that the use of the easement by Shelton, her family, and her friends for parking was sufficiently continuous to establish prescription. We affirmed the circuit court's determination that Shelton's use, as described, was sufficient to satisfy the elements of a prescriptive easement.

With this law in mind, we must analyze the evidence of the use of the ditch to determine if such use was "continuous." John Godwin and Shane Bridgforth, members of Big Coon, testified that they (and other Big Coon members) have used the ditch for access to the Nixon property since at least 1991 when the road was flooded and impassable. Even Richard Metcalf, a member and partial owner of Five Forks, openly admitted that Nixon has "continuously" used the road and that Nixon "regularly" used the ditch when it was too wet to access the Nixon property. Further, Five Forks' argument also ignores other steps that Nixon took in maintaining the property, both the road and the ditch, since Five Forks owned the property.

19

Five Forks also argues that there was insufficient evidence of continuity of use because it took steps to block access to the road and the ditch by Nixon and its lessees. Five Forks explains that there were periods when it attempted to block Nixon's access to the ditch, including "for periods ranging from several days by felling trees across the ditch to the bridge blocking such use for the entire duck season of 2015–2016." In *Kelley*, *supra*, the appellee/owners of the land took numerous drastic measures *during the prescriptive period* attempting to terminate the appellants' use of the appellees' land.[6] *Kelley* is distinguishable here, however, because Five Forks failed to obstruct Nixon's use during the prescriptive period. In the above section D, The Litigation, we stressed that there were at least two distinct periods of activity. The first period was between 1998 and 2005. The second period was between 2005 and 2014. Assuming arguendo that Five Forks did take steps to obstruct use between 1998 and 2005; there is no evidence of attempted obstruction by Five Forks between 2005 and 2014. This second period of continuous use by Nixon is in excess of the seven-year prescriptive period required. *See Neyland*, *supra*; *see also* Ark. Code Ann. § 18-11-106; Ark Code Ann. § 18-61-101. Moreover, we very recently held that mere temporary absences of a claimant from the land he or she adversely possessed or periods of vacancy of such land that evince no intention of abandonment do not interrupt the continuity of the adverse possession, provided the absence or vacancy does not extend over an unreasonable period. *Anita G, LLC v. Centennial Bank*, 2019 Ark. App. 217, 575 S.W.3d

---

[6]They ran barbed wire across the road; they replaced barbed wires cut by the Kelleys; they removed a gate installed by the Kelleys and replaced the fence wire; they piled brush, logs, and other debris across the road; they posted no trespassing signs; they called the sheriff's office; and they felled trees across the road. *Kelley*, 56 Ark. App. at 58, 938 S.W.2d at 235–36.

Thus, on the basis of these facts, we cannot say with a definite and firm conviction that a mistake has been committed.

## 2. *The road easement*

In summary again, Nixon acquired ownership of its land in 1951. The record indicates that during dry weather, Nixon obtained access to its land by using a road that cut diagonally across a parcel of land known as the Coca Cola Property. In 1991, John Godwin leased the Nixon property for duck hunting. Around 1996, Godwin formed Big Coon Duck Club and continued to lease the Nixon property. Godwin testified that from 1991 to date, Nixon and Big Coon have used the road to gain access to the Nixon property in dry weather.

In 1998, some forty-seven years after Nixon acquired its property, Five Forks acquired ownership of the Coca Cola Property, which contained the road. In addition to the evidence as outlined above regarding the ditch, Richard Metcalf, a member of Five Forks, testified as follows about Nixon's use of the road:

Q: When Five Forks Hunting Club obtained this property, the road and the ditch were already there, were they not?

A: That's correct.

Q: And they [the road and ditch] were being used by the Nixons and their lessees [Big Coon] when you purchased the property. Correct?

A: That's correct.…

Q: Have they, have the lessees [Big Coon] continuously used the road to access the Nixon property since the hunting club – – –

A: The road, yes.

21

Not only did Five Forks have knowledge that Nixon used the road prior to Five Forks' acquisition, Five Forks repeatedly stated at trial and in its briefs on appeal that it does not object to Nixon's use of the road. Metcalf testified,

Q:    Do you have any intention of trying to block [Nixon] from using that road?

A:    No, sir.

And, specifically, in its statement of the case, Five Forks writes, "Five Forks has never objected to [Nixon's] use of the road in dry weather."

Based on the evidence in the record, the circuit court concluded the following:

> There was no evidence of how or exactly when the use of the road and ditch first began. Even so, Nixon's use, and that of its lessees, coupled with the facts showing that Five Forks knew that Nixon was using the road under a claim of right is sufficient to overcome any presumption that Nixon's use, even if it began permissive, remained so. . . .

> The court concludes that Nixon has, by a preponderance of the evidence established a prescriptive easement over the road and ditch. And, although a prescriptive easement may be abandoned by nonuse, . . . Nixon has not abandoned the easement.

Given these facts, we cannot say that the circuit court erred in concluding that Nixon obtained a prescriptive easement over the road as described in the circuit court's final judgment.

### C.  Multiple Prescriptive-Easement Awards

Five Forks additionally argues that the circuit court erred in awarding Nixon multiple prescriptive easements. According to Five Forks, the law does not support the awarding of

22

two easements. Five Forks' entire argument in its opening brief on the multiple easements is as follows:

> No case was cited by Nixon nor relied on by the Trial Court in which a court awarded multiple prescriptive easements for ingress and egress in the same trial. In fact, when multiple pathways have been used for access, Arkansas follows the rule that the property owner can delimit the easement, i.e., can define the path to be used, as discussed in the next section of this brief.

It is axiomatic that this court will not consider arguments that are unsupported by convincing argument or sufficient citation to legal authority. *E.g.*, *Mann v. Pierce*, 2016 Ark. 418, 505 S.W.3d 150. It is not until its reply brief that Five Forks attempts to develop and expound on its argument that the circuit court erred in awarding two distinct easements. However, this is too late to preserve the issue for review. *See Coleman v. Regions Bank*, 364 Ark. 59, 216 S.W.3d 569 (2005); *Rymor Builders, Inc. v. Tanglewood Plumbing Co.*, 100 Ark. App. 141, 265 S.W.3d 151 (2007).

Further, Five Forks' argument is without merit. It is true that the circuit court's judgment in this matter describes the easement over the road and the ditch separately, rejecting Nixon's assertion at trial that it had a single, unified easement consisting of all the land between the ditch and the road. The circuit court instead agreed with Five Forks' survey separately describing the road and the ditch easements based on Nixon's usage for ingress and egress. This is consistent with our supreme court's description that an easement is simply a *right* that one person has to use the land of another for a specific purpose. *See Loyd*, *supra*; *Schuman v. Stevenson*, 215 Ark. 102, 219 S.W.2d 429 (1949); *Millwood Sanitation & Park Co. v. Mattingly*, 100 Ark. App. 56, 264 S.W.3d 566 (2007). Thus, Nixon had the single right to use Five Forks' property to access its own property and historically used either

23

the road or the ditch, depending upon the circumstances and conditions. If the road was dry, it provided access; if the road was flooded and impassable, the ditch provided the necessary access. As such, we affirm on this point.

## D. Delimiting the Boating Easement

Next, Five Forks argues that the circuit court erred in failing to delimit Nixon's boating easement. Five Forks suggests that Nixon and Big Coon have additionally accessed the Nixon property via an alternate route through the southern part of the ditch to Long Pond and Little Bayou Meto, which is used by other neighboring hunting groups. Five Forks asserts that this route is more reliable than access via the ditch alone and is a preferable alternative route. It also cites cases holding that the owner of the servient estate has the right to delimit the easement. *See Carroll Elec. Coop. Corp. v. Benson*, 312 Ark. 183, 848 S.W.2d 413 (1993); *Howard v. Cramlet*, 56 Ark. App. 171, 939 S.W.2d 858 (1997).

In *Carroll Electric*, our supreme court held that the location of the undefined right-of-way must be reasonable to both the dominant and the servient estates, considering the condition of the place, the purposes for which it was intended, and the acts of the grantee. In *Howard*, we further held that the owner of the servient estate has the right to delimit the right-of-way, but if he or she fails to do so, the holder of the dominant estate may exercise this right, but in either case the location must be reasonable. However, both of those cases involved *written* grants of easements that were undefined as opposed to prescriptive easements and are, therefore, distinguishable from the present case.

Instead, the circuit court here cited *Jordan v. Guinn*, 253 Ark. 315, 485 S.W.2d 715 (1972), for the proposition that both the creation and extent of an easement by prescription

24

are determined by the adverse use of the property over a long period of time. The circuit court found that neither the route of the easement nor the manner of its use should be altered from that established by Nixon's use during the prescriptive period. This is because, unlike an express written grant of an easement, it is the use made of the property of another, not the language of the grant, that defines the location of the easement. *Jordan*, *supra*. The court also included a metes-and-bounds description of the easements in its final judgment, clearly defining the easements based on Nixon's use. In light of this record, we cannot say that the circuit court clearly erred in its findings and affirm on this point.

E. Reasonable Boating Restrictions

Finally, Five Forks argues that the circuit court erred in failing to impose what Five Forks calls "reasonable boating restrictions" on Nixon's use of the ditch. Five Forks members testified that Big Coon hunters would abuse their use of the ditch by traveling unsafely and too loudly at times, spoiling Five Forks' use of its property. Five Forks wants Nixon and its lessees to be required to travel the ditch using trolling motors at idle speed, asserting that this would add only a few minutes to Nixon's use of the ditch. The circuit court found that Five Forks had not made this complaint to Nixon before filing its lawsuit. The court also concluded that the manner in which Nixon and its lessees had boated through the ditch had not changed over the prescriptive period and declined to impose any "arbitrary" boating restrictions.

Five Forks relies on *Massee v. Schiller*, 243 Ark. 572, 420 S.W.2d 839 (1967), for its argument that the circuit court should balance the conflicting rights between Five Forks and Nixon. In *Massee* appellants had a prescriptive easement across the lands of the appellees.

25

After the prescriptive period had run, appellees fenced in their property so they could use it for a cattle pasture. Appellees also placed cattle guards at each end of appellants' easement, which was now fenced off. Appellants brought suit, alleging that appellees were interfering with their use of the easement in permitting cattle to roam over the easement and by placing cattle guards across the easement. The circuit court denied relief, allowing the cattle guards to remain. The Arkansas Supreme Court affirmed, holding that the installation of cattle guards did not unreasonably interfere with appellants' use of the easement. *Id.*

Five Forks' reliance on *Massee* is misplaced. The circuit court found that Nixon's manner of boating had not changed during the running of the prescriptive period. Five Forks does not address this finding at all. Here, the imposition of the boating restrictions at this time when none existed during the running of the prescriptive period would change and limit Nixon's use of its easement. Implicit in the circuit court's ruling was a finding that this would be an unreasonable change and a burden on Nixon's use of its prescriptive easement. Although Five Forks argues that this would be a slight burden of only a few minutes in Nixon's use of the ditch, it was the circuit court's duty to determine the reasonableness of the burden, and we cannot say that the circuit court was clearly erroneous in declining to impose the restrictions requested by Five Forks. Accordingly, we affirm the circuit court's decision.

Affirmed.

ABRAMSON and MURPHY, JJ., agree.

*Bridges, Young, Matthews & Drake PLC*, by: *Joseph A. Strode*, for appellant.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellee.